

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-09-00031-CR

_____

EDWARD RAY SMALLEY, JR., Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 173rd Judicial District Court
Henderson County, Texas
Trial Court No. A-16,050

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Justice Moseley

MEMORANDUM OPINION

A jury rejected the self-defense claim of Edward Ray Smalley, Jr. and found him guilty of the murder of Tony Moore, meting out a sentence of life imprisonment and a fine of $10,000.00.[1] On appeal, Smalley challenges the legal and factual sufficiency of the evidence upon which the jury rejected his self-defense theory and its finding that he had knowingly or intentionally committed murder.

## I.    FACTUAL AND PROCEDURAL HISTORY

After Moore's brother repeatedly and unsuccessfully attempted to make contact with Moore by telephone, the worried brother called the Athens Police Department and asked them to check on Moore at his residence. Officer Ronald McCurry was dispatched and, upon his arrival at Moore's house, he halted because his suspicions of foul play were aroused when he noticed an "[e]xcessive amount of blood" "on the door, the porch, the grass area just to the right side of the door," and on the landscaping rocks, a few of which were broken. The grass on the area just to the right of the porch was matted down as if people had been rolling around in it and the brick wall above the grass patch was covered with blood. A man's watch and a human tooth were found on the ground. The concrete sidewalk was spattered with blood and bore drag marks "most probably . . . made by dragging a large, heavy object over those rocks from the area on the sidewalk to the front door, or

_____

[1]This case was transferred to this Court from the Twelfth District Court of Appeals in Tyler as a part of the Texas Supreme Court's docket equalization program. We are not aware of any conflict between the precedent of the Tyler Court with precedent of this Court on any issue relevant to this appeal. *See* TEX. R. APP. P. 41.3.

2

into the residence."  Because it "looked like the scene of a violent confrontation," McCurry immediately contacted his supervisors and awaited their arrival.

When Sergeant Brett Morman and his partner, Jason Bosher, arrived, they went to the rear of the residence first, peered through a window, and saw Moore's prone body face down near the front door.  After entering the residence, the officers noticed that Moore's face had suffered trauma. They observed a substantial amount of blood on the inside of the residence, including on the front door, foyer, walls, adjacent rooms, hallways, carpet, and furniture.  While there was no sign of a struggle in the kitchen or utility room, there was blood evidence on the door jamb of the utility room close to the washer and dryer.  The house was in general disarray and it appeared as if a violent struggle had taken place.

Concluding this grisly scene to be evidence of a gruesome murder, the officers secured the area and contacted the Criminal Investigation Division, which dispatched several detectives, including James Bonnette, Greg Hill, and Sergeant Charles Gurley.  The detectives, assisted by Texas Ranger William Rudolfo Flores, then conducted a more detailed crime scene investigation. The many pictures taken of the crime scene, along with the eighty-six pieces of evidence collected, seemed to confirm the initial officers' conclusions.

Flores noticed that the back door had fresh "pry marks on the door plate, or the striker plate where the lock mechanism [was] on that door," as well as "on the frame and door itself."  "[T]he pry marks would have originated on the outside prying the door open and allowing entry into the

3

residence . . . that type of evidence would indicate possible forced entry into a residence." There was no blood found on the outside portion of the back door. From the pattern of blood evidence developed, Flores believed that an altercation had begun near the back door. The officers found a bloody shirt and part of a belt in the bathroom; the belt had been broken at the buckle and another part of it was found lying beside Moore's body in the living room. Moore's pockets had been turned inside-out as if someone had searched them and removed their contents.

Since the officers deduced that a struggle had taken place outside the house, they interviewed a neighbor, Virgil Feinsod. Feinsod reported that he had heard loud, yelling voices coming from Moore's residence on the night of the incident. When he looked out of his window, he saw a silhouette of a male closing Moore's door. He told officers that a white male who commonly drove a silver pickup truck had been living with Moore for a few weeks and that Moore drove a blue Ford and a 2003 Jaguar. The Jaguar was not on the premises. The officers noticed a silver/gray Isuzu pickup at the Moore residence and, upon searching it, quickly located a bill of sale of the vehicle issued to Smalley as the purchaser.

The officers commenced a search for Smalley while tracing charges that were being applied to Moore's credit card. The credit card charges had been made in Pasadena, a Houston suburb. Athens police were notified that, judging from the credit card purchases, Smalley was in the Houston area. By the time Hill and Gurley traveled to Houston, Smalley had been apprehended by the Houston Police Department and the Jaguar was simultaneously recovered.

4

The Athens police officers then retrieved Smalley and returned him to Athens. While there, he waived his *Miranda*[2] rights, and gave a videotaped statement to Hill and Gurley, which was played for the jury. In the statement, Smalley explained that he was kicked out into the streets after a family crisis and had been living in a roadside park when he met Moore. After they talked, Moore allowed Smalley to shower, clean up, and change clothes at his home. Smalley also began to help Moore with yard work and other odd jobs in exchange for payment. Despite this treatment, Smalley explained that he felt uncomfortable because he believed Moore was homosexual. Smalley said that Moore would make statements such as "I could take care of you," and other remarks that led Smalley to believe Moore was anticipating sexual favors in return for his kind treatment.

According to the statement Smalley gave, on the day of the incident, Smalley showered and was getting ready to go to his grandson's house when Moore allegedly hugged him and kissed him on the forehead. Smalley then pushed the 240-pound Moore away and said he was not interested. Moore said he understood and asked Smalley for a flashlight because the water would not drain from the washing machine. Smalley went to his truck to retrieve a flashlight, gave it to Moore, and went to the utility room to look at the washer. At that time, Moore proclaimed "it's time to pay up," hit Smalley with the flashlight, and grabbed his penis. Smalley punched back several times before Moore hit him with the flashlight again and stabbed him with a Bic pen, which stuck in his head. Moore grabbed Smalley once more and attempted to kiss him. Smalley started hitting him and "it

---

[2]*Miranda v. Arizona*, 384 U.S. 436 (1966).

5

just got out of hand." Smalley pulled the pen out of his head, almost passing out. He noted that Moore was "bleeding pretty good on the side of his face." At this time, Smalley exited the house to smoke a cigarette.

Moore pleaded for Smalley to return because he needed help so Smalley returned inside. However, when Smalley bent down to offer assistance, Moore grabbed him once again and tried to French kiss him. At that point, Smalley "went to work on him. It, I mean, it just got out of hand. Just, I mean, it just got way out of hand." After Smalley "started popping him pretty good," Moore went outside through the front door and began complaining that he was bleeding. Smalley next observed Moore with a rock in his hand. As Moore was coming in the door, he said, "I told you it's time to pay up." Smalley pushed Moore against the wall, caused the rock to fall outside and break, and "worked him" again. Smalley asked Moore to stop, but Moore continued to say it was time to pay up and attempted to grab him again. Smalley kneed Moore in the chest, grabbed Moore's head, smashed it against his knee, and threw him down by the door. Smalley, who claimed he was covered in blood, walked out of the back door for the third time and lit another cigarette. He also threw the Bic pen into the back of his truck. When Smalley went back inside, Moore was still saying it was time to pay up.

Smalley did not initially describe any fight that occurred outside in the yard, but revamped his story after Hill brought up the evidence that was found there. When asked why so much blood was found outside, Smalley just said, "well, we were both covered in blood." When Hill brought up

6

evidence of strangulation, Smalley said he had Moore in a choke hold several times. He denied dragging Moore into the house. Smalley said Moore was still talking while Smalley was cleaning himself up in the bathroom. Since Moore had allowed Smalley to drive his Jaguar in the past, Smalley took the car and left. Smalley admitted that he had been drinking Crown Royal and Kentucky Deluxe whiskey. Toward the end of the interview, Smalley claimed he had lapses of memory and possibly drank too much, saying that it was possible that Moore was choked outside and dragged back inside.

Hill noted there were no signs of severe injury on Smalley and opined that he did not believe Smalley's head had been penetrated by the Bic pen because the injury to Smalley's head was not deep enough. There was some dried blood on Smalley's ear.

Medical examiner Tracy Dyer had conducted an autopsy of Moore's body. She explained that there were "significant external injuries" on Moore's head and neck, including "quite a few abrasions . . . [with] superficial lacerations or tearing of the skin . . . [l]arge contused abrasions involving the cheek and right eye . . . two large abraded contusions [to the back of the head]. There were also "a number of injuries involving the mouth . . . [and] lacerations of the . . . lower lip," as well as "a significant laceration through the" upper lip. A central tooth had been knocked out and another one was very loose. Dyer stated, "The variety of the blunt-force injuries to the head were significant . . . [T]here are injuries on basically every aspect of the head, the sides, the front, the back. Many, many separate blows would have been required to sustain all of those injuries." The autopsy

7

revealed that there was hemorrhage in the deep scalp and also bleeding right on top of Moore's brain. External injuries to Moore's neck, hemorrhages in the neck, capillaries, and veins surrounding the eyes, and a fractured hyoid bone suggested Moore had been strangled. Dyer stated, "the strangulation is probably what terminated his life. I don't think there would have been any discussion after the strangulation part." Dyer testified, "It takes quite a bit of force to cause hemorrhage like this in the neck," and explained that the hyoid bone, which "is a relatively protected structure . . . It actually requires quite a bit of compression on the upper aspect of the neck to fracture it." It was also her opinion that Moore would have been unable to walk around the house, speak, or pull on someone after the strangulation had occurred.

Dyer finally stated there were abrasions and contusions on the arms and legs, which were consistent with being dragged. Due to the coloring of these marks, Dyer concluded they were inflicted post-mortem. Importantly, there were no significant injuries to Moore's hands or knuckles.

After hearing the evidence above, a jury found Smalley guilty under count two of the indictment, which alleged that Smalley either intentionally, knowingly, or by committing an act clearly dangerous to human life, caused the death of Moore by striking him in the head, strangling him, or by "a manner and means unknown." They additionally found that Smalley used or exhibited an unknown deadly weapon during the commission of the offense.

8

## II.    STANDARD OF REVIEW

Smalley contends that the evidence was legally and factually insufficient to support the rejection of his self-defense theory and necessarily concurrent finding that he possessed the requisite *mens rea* for the offense.  Legal and factual sufficiency questions involve separate analyses.  *Clewis v. State*, 922 S.W.2d 126, 132–33 (Tex. Crim. App. 1996).  When conducting this analysis, we review all of the evidence in the light most favorable to the verdict and determine whether any rational jury could find the essential elements of the crime beyond a reasonable doubt, and also find against Smalley on the self-defense issue beyond a reasonable doubt.  *Lacour v. State*, 8 S.W.3d 670, 671 (Tex. Crim. App. 2000) (citing *Jackson v. Virginia*, 443 U.S. 307 (1979)); *Clewis*, 922 S.W.2d at 132–33; *Saxton v. State*, 804 S.W.2d 910, 914 (Tex. Crim. App. 1991).

Once we determine the evidence has raised issues for the jury's resolution, we will not then sit as the thirteenth juror re-evaluating the weight and credibility of the evidence.  *Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007); *Dewberry v. State*, 4 S.W.3d 735, 740 (Tex. Crim. App. 1999).  Instead, we give full play to the jury's responsibility to weigh the evidence, resolve conflicts in the testimony, and draw reasonable inferences from basic facts.  *Johnson v. State*, 23 S.W.3d 1, 7 (Tex. Crim. App. 2000); *Clewis*, 922 S.W.2d at 133; *Bottenfield v. State*, 77 S.W.3d 349, 354 (Tex. App.—Fort Worth 2002, pet. ref'd) (citing *Jackson*, 443 U.S. at 319).  We are not free to re-weigh the evidence and set aside the jury verdict merely because we feel a different result is more reasonable.  *Clewis*, 922 S.W.2d at 135.  We do not engage in a second evaluation of the

9

evidence, but only ensure that the jury reached a rational decision. *Cuong Quoc Ly v. State*, 273 S.W.3d 778, 783 (Tex. App.—Houston [14th Dist.] 2008, pet. ref'd) (citing *Muniz v. State*, 851 S.W.2d 238, 246 (Tex. Crim. App. 1993)). Thus, we give due deference to its determinations and will find the evidence factually insufficient only when necessary to prevent manifest injustice. *Johnson*, 23 S.W.3d at 8–9, 12; *Clewis*, 922 S.W.2d at 133, 135. Unlike our legal sufficiency review, we examine the evidence in a neutral light when assessing factual sufficiency and determine whether the proof of guilt is so obviously weak as to undermine confidence in the verdict, or, if taken alone, is greatly outweighed by contrary proof so as to be clearly wrong and unjust. *Zuliani v. State*, 97 S.W.3d 589, 595 (Tex. Crim. App. 2003); *Johnson*, 23 S.W.3d at 11; *Cain v. State*, 958 S.W.2d 404, 407 (Tex. Crim. App. 1997); *Harris v. State*, 133 S.W.3d 760, 764 (Tex. App.—Texarkana 2004, pet. ref'd). A clearly wrong and unjust verdict is one which is manifestly unjust, shocks the conscience or clearly demonstrates bias. *Santellan v. State*, 939 S.W.2d 155,165 (Tex. Crim. App. 1997).

We also measure the evidence "against the elements of the offense with the same kind of analysis as that applied in the test for a hypothetically-correct jury charge for the case."[3]  *Ferralez v. State*, No. 06-08-00064-CR, 2009 WL 454335, at *1 (Tex. App.—Texarkana Feb. 25, 2009, no pet.) (mem. op., not designated for publication) (citing *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)); *see also Grotti v. State*, 273 S.W.3d 273, 280 (Tex. Crim. App. 2008). The

---

[3]*Malik* controls "*even in the absence of alleged jury charge error.*"  *Gollihar v. State*, 46 S.W.3d 243, 255 (Tex. Crim. App. 2001).

hypothetically correct jury charge "sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried." *Malik*, 953 S.W.2d at 240. It is used to evaluate both legal and factual sufficiency. *Grotti*, 273 S.W.3d at 281.

III. **ANALYSIS**

A. **Sufficient Evidence Supported the Rejection of Smalley's Self-Defense Theory**

Self-defense is justified when a person "reasonably believes the force is immediately necessary to protect . . . against the other's use or attempted use of unlawful force." *See* TEX. PENAL CODE ANN. § 9.31(a) (Vernon Supp. 2008).

A person is justified in using deadly force against another:

> (1)    if he would be justified in using force against the other under Section 9.31;
>
> (2)    if a reasonable person in the actor's situation would not have retreated;[4] and
>
> (3)    when and to the degree he reasonably believes the deadly force is immediately necessary:

---

[4]The "retreat" portion of Section 9.32 has been deleted by the Legislature, but was in effect at the time of the offense. *See* Act of March 20, 2007, 80th Leg., R.S., ch. 1, §§ 3, 5, 6, 2007 Tex. Gen. Laws 1, 2.

(A)  to protect himself against the other's use or attempted use of unlawful deadly force; or

(B)  to prevent the other's imminent commission of . . . sexual assault.

Act of May 16, 1995, 74th Leg., R.S., ch. 235, § 1, 1995 Tex. Gen. Laws 2141 (amended 2007) (current version at TEX. PENAL CODE ANN. § 9.32 (Vernon Supp. 2008)).

It was within the jury's province to resolve conflicts and decide which version of the events to believe. *See Wesbrook v. State*, 29 S.W.3d 103, 111–12 (Tex. Crim. App. 2000). In doing so, the jury could reasonably conclude that Smalley did not act in self-defense. The jury heard Flores testify that there were pry marks on the back door, evidence which would suggest that Smalley had broken into Moore's home. The blood evidence found at the scene led Flores to believe that the altercation had begun at the back door, not—as Smalley maintained—in the utility room. The lack of injury to Moore's hands and knuckles could also lead the jury to believe that Moore did not strike Smalley with his fists. Moreover, Smalley's statement that Moore hit him over the head with a flashlight could be disbelieved, given the fact that the flashlight (which was found in the Jaguar driven by Smalley from the scene of the crime), tested negative for blood traces.

Even if the jury believed Smalley's version of events (i.e., that Moore continued to make sexual advances toward Smalley even during and after infliction of extensive life-threatening injuries), self-defense is only justified when *immediately necessary* to protect against another's use of unlawful force, and deadly force is only justified if a reasonable person would not have retreated

12

from the situation. Smalley admitted that he beat Moore several times immediately after he was hit by the flashlight. Under Smalley's version of events, he left Moore bleeding in the utility room as he walked outside and smoked a cigarette and was not followed outside by Moore. At this point, had there been a threat of unlawful force from Moore, it no longer existed and a reasonable person would have retreated. Instead, Smalley returned inside the house, beat Moore once again, went outside to his truck to have another cigarette, and continued the process even another time.

Reviewing the record under the appropriate standard, we find the evidence legally and factually sufficient to support the jury's rejection of Smalley's self-defense claim. *Zuliani*, 97 S.W.3d 595. This point of error is overruled.

### B. Sufficient Evidence Supported the Jury's Finding of Intentional Murder

Count II of the indictment alleged that Smalley "did then and there intentionally or knowingly cause the death . . . of TONY MOORE, by striking TONY MOORE in the head or by strangling TONY MOORE, or in a manner and means unknown"or, alternatively, that Smalley "with intent to cause serious bodily injury to an individual, namely, TONY MOORE, commit an act clearly dangerous to human life that caused the death of said TONY MOORE, by striking TONY MOORE in the head or by strangling Tony Moore, or in a manner and means unknown . . . ." Employing the hypothetically correct jury charge analysis, in order for the State to prove that Smalley was guilty of the murder of Moore as alleged, the State was required to prove either: (A) that (1) Smalley (2) intentionally or knowingly (3) caused Moore's death; TEX. PENAL CODE ANN. § 19.02(b)(1)

13

(Vernon 2003) or (B) that (1) Smalley, (2) intended to cause serious bodily injury[5] to Moore, (3) committed an act clearly dangerous to Moore's life, and (4) that act caused Moore's death. TEX. PENAL CODE ANN. § 19.02(b)(2) (Vernon 2003).

Smalley admitted that he caused most of Moore's injuries which resulted in death, but took the position that he was defending himself against Moore. On appeal, Smalley has put forth no argument regarding the applicability of Section 19.02(b)(2) of the Texas Penal Code. Accordingly, we will address (and will overrule) his only argument: that there is not sufficient evidence to prove that he intentionally or knowingly caused Moore's death. Smalley acted intentionally if it was his "conscience objective or desire to engage in the conduct or cause the result." TEX. PENAL CODE ANN. § 6.03(a) (Vernon 2003). He acted knowingly if he was "aware that his conduct [was] reasonably certain to cause the result." TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003).

Flores testified that the back door was pried open and that it was apparent that an altercation which caused Moore to bleed commenced near that door. Blood was found throughout most of the residence, but was absent from the utility room, the location that Smalley claimed the altercation to have begun. Moore was able to escape outside. Bloodied rocks indicated that someone was struck with a landscaping rock. Although Moore sustained many blood-producing injuries, Hill testified that there were no severe injuries found on Smalley. However, blood was located outside on the

---

[5]"Serious bodily injury" means "bodily injury that creates a substantial risk of death or that causes death, serious permanent disfigurement, or protracted loss or impairment of the function of any bodily member or organ." TEX. PENAL CODE ANN. § 1.07(46) (Vernon Supp. 2008).

sidewalk, on the grass where it appeared a violent struggle was fought, and on the brick wall above the grass patch. A human tooth was located outside; Moore's body had a recently-missing tooth. Feinsod heard yelling coming from Moore's front yard, which eventually subsided and then Feinsod saw one man close Moore's door. Moore's injuries were extensive and the probable cause of death was strangulation. Post-mortem injuries to the arms and legs and drag marks on the sidewalk both indicated that Moore's body had been placed on top of rocks and dragged back through the front door to the inside of the house, where a considerable amount of blood had been found. The blunt force injuries to Moore's body were extensive in number. The strangulation occurred with such force that the hyoid bone was broken. Moore's pockets were "picked," his car was taken, and his credit card was used by Smalley.

In reviewing the evidence above, we conclude that it was legally and factually sufficient, such that a rational jury could find Smalley intentionally or knowingly caused Moore's death based on the hypothetically correct jury charge. *See Lacour*, 8 S.W.3d at 671.

## IV. CONCLUSION

We affirm the judgment of the trial court.

Bailey C. Moseley
Justice

Date Submitted:     May 19, 2009
Date Decided:      May 22, 2009

Do Not Publish